**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

        v.                                       15-CR-160-A
                                                **DECISION AND ORDER**

BRENDA MANSOUR,

            Defendant.
_____

      This case is before the Court on several motions filed by the Defendant, Brenda Mansour. The Defendant first moves to suppress evidence recovered from a warrantless administrative search of the convenience store at which she worked. That search was conducted by investigators from the New York State Department of Taxation and Finance (DTF) with the purpose of ensuring that the deli was in compliance with New York State laws related to the State's excise tax on cigarettes. During their search, the DTF investigators found, as they had during recent searches of other delis, packets of synthetic marijuana. The investigators gave the synthetic marijuana to agents from Homeland Security Investigations (HSI), who had accompanied the DTF investigators. The Defendant was then interviewed by the HSI agents.

      The Defendant now moves to suppress the synthetic marijuana found during the search. She also moves to suppress the statements she made to the HSI agents. Magistrate Judge Scott, to whom the Court referred this case for all pretrial proceedings, recommends denying both motions. For the reasons stated below, the Defendant's objections are overruled, and the Court adopts Judge Scott's recommendations.

## BACKGROUND

The Court briefly recites only those facts necessary to resolve the Defendant's objections.

At approximately 7:00 p.m. on May 27, 2015, investigators from the New York State Department of Taxation and Finance conducted a regulatory inspection of Mario's Deli in Niagara Falls, New York. The Defendant, whose parents own the deli, was working as the manager that evening. According to the DTF investigators, the purpose of their inspection was to ensure that the deli was in compliance with laws related to New York State's excise tax on cigarettes. Specifically, the investigators testified that they were looking for invoices to "match . . . what [the deli] ha[d] on the shelves," cigarettes with "discrepancies" in their New York State tax stamp, and cigarettes that were "possibly shipped in from out of state" and which did not "have . . . stamp[s] on [them]." Tr. 6:11-15; 67:23 – 68:4.

The search was conducted by three investigators from the DTF. The investigators were accompanied, however, by several local police officers. According to one DTF investigator, the police officers accompanied the investigators because the officers "know the area a lot better than [the DTF investigators] do so if we're walking into a place that . . . wasn't as nice as some of the other ones . . . they would be there for support." Tr. 7:14-18. One of the officers was a Niagara County Sheriff's Deputy, who locked—and then blocked—the deli's front entrance. Tr. 15:19-21; 73:1-3; 138:8-9. A DTF investigator described this as a "common practice." Tr. 19:24.

In addition, and as is particularly relevant in this case, the DTF investigators were accompanied by two agents from Homeland Security Investigations (HSI), a component

of U.S. Immigration and Customs Enforcement. During recent inspections of *other* cigarette retailers, DTF investigators had "been finding a lot of synthetic marijuana." Tr. 8:1-2; 51:2-5; 69:4-8. When they did, the DTF investigators called agents from HSI to take custody of the synthetic marijuana. Tr. 8:1-5; 60:17-20. In the case of Mario's Deli, however, HSI agents accompanied the DTF investigators to allow the investigators to be "more productive"—that is, rather than "slowing down [the DTF investigators'] productivity [by] waiting for another agency to respond," HSI agents would be able to immediately take custody of any synthetic marijuana that the DTF investigators might discover during their search. Tr. 69:9-19. This was the first time the DTF investigators had brought an HSI agent with them (Tr.17:25; 60:21-23), but neither the DTF investigators nor their supervisors chose to bring HSI agents to Mario's for any particular reason. Indeed, each of the three DTF investigators who conducted the search of Mario's testified that they had no reason to believe that synthetic marijuana would be found there. Tr. 19:10-16; 69:22-24; 81:12-14.

Nonetheless, the DTF investigators quickly found synthetic marijuana in two locations at Mario's. Several DTF investigators recalled seeing the Defendant throw something as the investigators entered the deli. Tr. 9:14-15; 36:15-18. One DTF investigator then walked behind the counter and found a box. Inside that box was a cigar box, and inside the cigar box were packets of synthetic marijuana. The DTF investigator then told HSI Special Agent Edward Williams about what she had found.[1] Tr. 113:2. After notifying Agent Williams of the synthetic marijuana, the DTF

---

[1] Agent Williams testified that DTF Investigator Barbera approached him approximately 20 to 25 minutes after the investigators entered the deli. Tr. 113:2. Investigator Barbera, on the other hand, testified that she located the synthetic marijuana shortly after entering the store (36:15-18) and then "immediately contacted" Agent Williams. Tr. 39:18. This discrepancy does not affect the Court's conclusions in this case.

investigator found more synthetic marijuana in an open bag behind the sales counter. Tr. 42:18 – 43:6.

After the DTF investigators found the synthetic marijuana, the Defendant was approached by Agent Williams and HSI Task Force Officer Farkas.[2] According to Agent Williams, he and Task Force Officer Farkas "[went] over, . . . identif[ied] oursel[ves] with Government-issued identification verbally and asked if [the Defendant] would be willing to discuss" the synthetic marijuana that had been discovered by the DTF investigators. Tr. 104:15-19. The Defendant agreed, and the agents asked whether "there was a spot in the store like an office or something that she would like to go to talk with [the agents]." Tr. 105:22-24. According to Agent Williams, the Defendant suggested "go[ing] to the back of the store," an area that was not enclosed and that was "still in the main part of the store." Tr. 106:1-12. The Defendant's description of the interview location was slightly different, but not inconsistent with Agent Williams's: according to the Defendant, she and the agents went into a corner "where it was blocked off, no one else could see. You could see the front counter . . . . You could see the doors." Tr. 154:25 – 155:5.

Agent Williams was armed, but his firearm remained holstered on his hip during the search and questioning. Tr. 109:13 – 110:1. Further, Agent Williams did not use handcuffs or any "physically threatening stance," nor did he see any other investigator or officer do so. Tr. 110:8-14; 176:2-4. As noted, however, during the interview a Niagara Falls Sheriff's Deputy remained at the deli's door. According to the Defendant,

---

[2]  Agent Williams described Task Force Officer Farkas as an "HSI representative who was a task force officer." Tr. 102:2-3. The record does not show what agency employed Task Force Officer Farkas, but given Agent Williams's description of him as an "HSI representative," for purposes of this Decision and Order the Court treats Task Force Officer Farkas as an agent of Homeland Security Investigations.

the door was locked and "[c]ustomers were trying to get in, they would unlock it and tell the customers the store is currently closed."  Tr. 158:21-23.

At the back of the store, Agent Williams informed the Defendant that she was not under arrest, that she did not need to speak to the agents, that she was free to leave the store, and that he wanted to discuss "some concerns that we had regarding the suspected synthetic marijuana."  Tr. 106:16-20; 107:10-13.  Agent Williams did not read the Defendant her *Miranda* rights because, according to Agent Williams, "[s]he wasn't in custody."  Tr. 106:25.  After the Defendant agreed to speak to the agents, Agent Williams informed her that selling synthetic marijuana is a violation of federal law and that she could be prosecuted for doing so, to which the Defendant responded, "awe, f--- me."  Tr. 107:6-22.  *See also* Tr. 119:10-18.  The Defendant testified that she "was scared for my life, thought I was going to get arrested because he told me that it was something serious, it was killing people."  Tr. 155:6-9.

The agents then asked the Defendant questions about "how she obtained the packages."  Tr. 108:1-2.  Specifically, Agent Williams asked the Defendant "if she would be willing to kind of cooperate with us further to further the investigation to . . . her supply chain."  Tr. 11:8-10.  Agent Williams testified that he "made no threats," but that he did "advise[] [the Defendant] that providing information . . . would not be a bad thing." Tr. 116:16-20.  Indeed, Agent Williams was vehement that he did not "make promises . . . about what will happen if" the Defendant cooperated.  Tr. 118:18-19.  The Defendant testified that she "thought [she] was getting arrested" if she did not cooperate.  Tr. 158:10.  She then answered Agent Williams's questions with "general information about the price she paid for each packet of the suspected synthetic

marijuana; how much she sold it for; a general, vague description of the individual . . . she obtained it from. Kind of logistics behind it." Tr. 124:3-6. The Defendant described Agent Williams as "civil" and "calm" during the interview (Tr. 157:16; 173:20), and she testified that she thought Agent Williams "was trying to help [her] out." Tr. 162:6. Ultimately, the Defendant concluded, although she was not arrested, she "thought [she] was gonna be under arrest." Tr. 175:2-11.

At the end of the interview, Agent Williams gave the Defendant his business card and asked her to call him the next day. Tr. 111:11-13; 161:25 - 162:2-5. The entire conversation lasted approximately ten minutes. Tr. 108:5.

The Defendant was ultimately charged with two counts of possessing, with intent to distribute, synthetic marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). *See* Docket No. 9 (Indictment). In proceedings before Judge Scott, the Defendant moved to suppress evidence recovered from the search of Mario's Deli. She also moved to suppress her statements to Agent Williams. As to her first motion, the Defendant argues, generally, that the search was not a true regulatory search, but that it was instead conducted with the intent of finding evidence of a crime. As to her second motion, the Defendant argues that she was in "custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that her un-*Mirandized* statements must therefore be suppressed.

Judge Scott recommends denying both motions. The Defendant objects to those recommendations. The Court therefore reviews each recommendation *de novo*. 28 U.S.C. § 636(b)(1).[3]

---

[3] In proceedings before Judge Scott, the Defendant also moved to dismiss the indictment based on the Supreme Court's decision in *McFadden v. United States*, 135 S. Ct. 2298 (2015). Judge Scott

**DISCUSSION**

**1. Whether searches conducted pursuant to New York Tax Law § 474(4) comply with the Fourth Amendment**

The search in this case was conducted by investigators from the criminal division of the New York State DTF. In conducting their search, the investigators acted pursuant to authority conferred by New York State Tax Law § 474(4). Section 474(4) provides, in relevant part, as follows:

> The commissioner of taxation and finance is hereby authorized to examine the books, papers, invoices and other records of any person in possession, control or occupancy of any premises where cigarettes or tobacco products are placed, stored, sold or offered for sale, and the equipment of any such person pertaining to the stamping of cigarettes or the sale and delivery of cigarettes or tobacco products taxable under this article, as well as the stock of cigarettes or tobacco products in any such premises.

After the parties filed their briefing on the Defendant's objections, the Court directed the parties to file additional briefs addressing the Supreme Court's recent decision in *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015). As relevant here, *Patel* observed that, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject to the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* at 2452. Section 474(4), the Court noted, does not provide such an opportunity. The Court therefore directed the parties to file briefs addressing whether searches conducted pursuant to § 474(4) comply with the Fourth Amendment. And because the

---

recommends denying that motion. The Defendant did not object to Judge Scott's recommendation, and the Court therefore reviews the recommendation for clear error. *See United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009) ("The district court may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record.") Finding none, the Court adopts Judge Scott's recommendation to deny the Defendant's motion to dismiss.

Court's order implicated the constitutionality of a state statute, the Court invited the New York State Attorney General to file a brief stating his position on this question. The Attorney General has done so.

All parties appear to agree that, to determine the constitutionality of § 474(4), the Court must first decide whether cigarette retailers are "pervasively regulated" or "closely regulated," as the Supreme Court has defined those terms.[4] Over the past several decades, the Supreme Court has identified a handful of industries that are subject to pervasive and often longstanding regulation arising from the industries' "relatively unique circumstances." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978). These industries "have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Id.* In other words, in the case of a heavily-regulated industry, the question whether a search is a "reasonable" one under the Fourth Amendment is answered with a recognition that, "when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation." *Id. See also New York v. Burger*, 482 U.S. 691, 702 (1987) ("[W]here the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.") Closely-regulated industries, however, are "the exception," *Barlow's*, 436 U.S. at 313, a point reinforced by the fact that the Supreme Court has identified only four industries that are closely

_____
[4] "Courts appear to use the terms 'closely' and 'pervasively' interchangeably," and the Court does so in this case. *United States v. Kolokouris*, No. 12-CR-6015-FPG-MWP, 2015 WL 4910636, at *19 n.15 (W.D.N.Y. Aug. 14, 2015), *report and recommendation adopted by* 2015 WL 7176364 (W.D.N.Y. Nov. 13, 2015).

regulated: liquor retailers, *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970); firearms dealers, *United States v. Biswell*, 406 U.S. 311 (1972); mining, *Donovan v. Dewey*, 452 U.S. 594 (1981); and automobile junkyards, *New York v. Burger*, 482 U.S. 691 (1987).[5]

Here, if the Court concludes that cigarette retailers are pervasively regulated, *Patel*'s concern about precompliance review is irrelevant. In that case, § 474(4) would, at least as a general matter, authorize DTF investigators to conduct warrantless regulatory searches of cigarette retailers. But that would not end the Court's Fourth Amendment analysis: Even if the Court concludes that cigarette retailers *are* pervasively regulated, to determine whether the search in this case was constitutional the Court must also decide whether searches conducted pursuant to § 474(4) are "reasonable," as the Supreme Court has defined that term.

For the reasons that follow, the Court concludes that cigarette retailers are pervasively regulated in New York State and that searches conducted pursuant to § 474(4) are "reasonable" under the Fourth Amendment. This is because warrantless searches under § 474(4) "further urgent [State] interest[s]"—namely, enforcement of a regulatory scheme designed to ensure that all cigarettes sold in New York State are taxed—and because, given § 474(4)'s limits on the scope of a regulatory search, as well as the way in which the New York Court of Appeals has interpreted the statute, "the possibilities of abuse and the threat to privacy are not of impressive dimensions." *Biswell*, 406 U.S. at 316.

---

[5] Lower courts have identified a number of other industries that are pervasively regulated. *See* 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.2 at 42-43 & § 10.2(e) at 79 n.152 (5th ed. 2012) (identifying industries and cases).

## A. Whether cigarette retailers are pervasively regulated

The Court first addresses whether cigarette retailers are pervasively regulated.

To determine whether an industry is pervasively regulated for Fourth Amendment purposes, the Supreme Court has identified three factors for courts to consider. A court must consider, first, whether the degree and scope of regulation is "extensive" or otherwise pervasive. *See Burger*, 482 U.S. at 703-04. Next, the court must consider the extent to which other states have "imposed similarly extensive regulations" on the industry in question. *Id.* at 705. And finally, the court must examine the duration of the regulatory scheme at issue. *Id.* at 705-07.

These three factors need not be present in equal measure, however. *See Patel*, 135 S. Ct. at 2459 (Scalia, J., dissenting) ("These factors are not talismans, but shed light on the expectation of privacy the owner of a business may reasonably have, which in turn affects the reasonableness of a warrantless search.") The most important factor is, intuitively, "the pervasiveness and regularity" of the inspection program. *Dewey*, 452 U.S. at 606 (noting that this factor "ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment"). For example, the Supreme Court has concluded that certain industries are pervasively regulated where the regulatory scheme at issue was relatively novel. *See Biswell*, 406 U.S. at 315 ("Federal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry, but close scrutiny of this traffic is undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders."); *Dewey*,

452 U.S. at 606 ("[I]f the length of regulation were the only criterion, absurd results would occur.")

The Court will therefore examine each of the *Burger* factors to determine whether the cigarette industry in New York is pervasively regulated. In doing so, however, the Court is mindful that the most important factor is the degree and scope of regulation.

### i. The degree or intensity of regulation

First, to determine whether an industry is closely regulated, the Supreme Court looks to the degree to which the industry is regulated. *See Burger*, 482 U.S. at 704 ("The provisions regulating the activity of vehicle dismantling are extensive."); *Dewey*, 452 U.S. at 603 ("[T]he regulation of mines [the Mine Safety and Health Act of 1977] imposes is sufficiently pervasive and defined that the owner of such a facility cannot help but be aware that he will be subject to effective inspection.") (quotation marks omitted). There can be little question that New York State regulates the distribution and sale of cigarettes with an intensity reserved for few other industries; as the Attorney General observes, "cigarettes and other tobacco products are among the most heavily regulated products available in New York." Docket No. 51 at 13.

Underlying New York's regulatory scheme is the State's $4.35 excise tax on every pack of cigarettes—the highest in the United States. N.Y. Tax Law § 471(1). *See Map of Excise Tax Rates on Cigarettes*, Centers for Disease Control and Prevention (last visited Apr. 27, 2017), https://www.cdc.gov/statesystem/excisetax.html. A large portion of the State's regulatory scheme—and, ultimately, the warrantless inspection program at issue in this case—is designed to ensure that that tax is paid on all cigarettes sold in New York State. As the Second Circuit has summarized New York's

regulatory framework for the distribution and sale of cigarettes, the DTF "'precollects' the tax from a limited number of state-licensed stamping agents, and mandates that these agents be the only entry point for cigarettes into New York's stream of commerce. Stamping agents, often wholesalers themselves, purchase tax stamps from the State and cigarettes from manufacturers. Before selling the cigarettes to other wholesalers or retailers, agents must affix a tax stamp to each pack of cigarettes to demonstrate the payment of the tax. Agents incorporate the cost of the stamp into the pack's price and pass the cost along the distribution chain to the consumer." *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011) (citations and footnote omitted). Further, any person transporting unstamped cigarettes within the State must "have in his actual possession invoices or delivery tickets for such cigarettes." N.Y. Tax Law § 474(1). This comprehensive framework, which is designed to ensure that all cigarettes sold in New York bear a tax stamp, is buttressed by both state and federal criminal penalties. *See* N.Y. Tax Law § 1814; 18 U.S.C. § 2342.

New York's intense regulation of cigarette sales continues at the retail level. All cigarette retailers must be licensed and registered with the DTF, *see* N.Y. Tax Law § 480-a, and risk suspension or revocation of their license for possessing or selling unstamped cigarettes. *Id.* at § 480-a(4). A cigarette retailer must open a shipment of cigarettes within 24 hours of receipt "for the purpose of ascertaining whether or not the . . . packages have affixed thereto the proper tax stamp." *Id.* § 473. A cigarette retailer must retain invoices containing detailed information about its cigarette purchases for a period of three years. *Id.* § 474(4). And to ensure that the consumer bears the "ultimate incidence of and liability for" the State's cigarette tax, *id.* § 471(2), cigarette

retailers are subject to price controls: they cannot, among other things, sell cigarettes below cost "with intent to avoid the collection or paying over" of State cigarette taxes. *Id.* § 484(a)(1).

Finally, retailers are restricted in how and to whom they sell cigarettes. Retailers must store all tobacco products behind the counter or in a locked cabinet. N.Y. Public Health Law § 1399-cc(7). They may not sell cigarettes that are not in the manufacturer's packaging with the applicable health warnings. *Id.* § 1399-gg(1). And they may not sell cigarettes to minors. *Id.* § 1399-cc(3).

Put succinctly, New York's regulatory scheme for the distribution and sale of cigarettes is both far-reaching and comprehensive. And it is that way for a reason: "[I]t assures that [cigarettes] are distributed through regular channels and in a traceable manner and makes possible the prevention of sales to undesirable customers and the detection of the origin of particular [cigarettes]." *Biswell*, 406 U.S. at 315-16 (affirming the constitutionality of a regulatory scheme authorizing warrantless inspections of federal firearms licensees). The first—and most important—factor in determining whether the cigarette industry is pervasively regulated is, therefore, very easily satisfied.

### ii. Whether other states have imposed similar regulations

Second, to determine whether an industry is pervasively regulated, the Supreme Court looks to whether other states "have imposed similarly extensive regulations" on the industry in question. *Burger*, 482 U.S. at 705. Forty-seven states require, as New York does, "that tax stamps be placed on cigarette packages as evidence that state cigarette taxes were paid."[6] U.S. General Accounting Office, *Cigarette Smuggling:*

---

[6] The three states that do not use tax stamps are North Carolina, North Dakota, and South Carolina. *See Use of Tobacco Tax Stamps to Prevent and Reduce Illicit Tobacco Trade—United States, 2014*, Centers

*Federal Law Enforcement Efforts and Seizures Increasing* at 4 n.3 (May 2004).  And the "general industry pattern" for affixing tax stamps to cigarettes is the same as New York's.  *Id.* at 3.  It is unclear how many other states use, as New York does, warrantless inspections to enforce their cigarette excise tax, but the Attorney General points to a recent decision from the Seventh Circuit which considered (and found to be constitutional on plain error review) the regulatory scheme for cigarettes in Cook County, Illinois, which is similar to New York's.  *See United States v. Hamad*, 809 F.3d 898, 904-07 (7th Cir. 2016).

But even if other states do not use warrantless inspections to enforce their cigarette excise tax, the way in which other states tax cigarettes still supports the conclusion that a cigarette retailer in New York State has (or should have) a lowered expectation of privacy in his or her business.  New York State, as noted, has the highest cigarette excise tax in the United States, and the "disparity among the states' excise taxes" creates a strong incentive to sell out-of-state cigarettes in states such as New York.  U.S. Dep't of Justice, Office of the Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Efforts to Prevent the Diversion of Tobacco* at i (Sept. 2009).  *See also id.* at 7 ("ATF describes the diversion of tobacco as a global problem and believes illegal cigarettes are the number one black market commodity in the world."); *id.* at 10 ("This disparity [in excise tax rates among states] gives criminals an incentive to buy cigarettes in a low tax state . . . and resell at a profit in a high tax state.")  In other words, the fact that New York's cigarette excise tax is higher than any other state's supports the conclusion that, regardless of how other states enforce their

for      Disease      Control      and      Prevention      (May      29,      2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6420a2.htm.

cigarette excise tax, a New York cigarette retailer should reasonably expect at least some intrusion by DTF investigators to ensure that the retailer is not taking advantage of the "large profits" (*id.* at 13) available to those who sell out-of-state cigarettes. Indeed, in this case, one of the DTF investigators testified that, during his search of Mario's Deli, he was looking for cigarettes that were "possibly shipped in from out of state" or from Native American reservations.  Tr. 6:11-15; 67:23 – 68:4.

### iii.     The duration of the regulatory scheme

Third and finally, the Supreme Court has observed that, to determine whether an industry is closely regulated, "the 'duration of th[e] particular regulatory scheme' has some relevancy."  *Burger*, 482 U.S. at 705 (quoting *Dewey*, 452 U.S. at 606) (brackets omitted, punctuation altered).  This factor is easily satisfied in this case.  It is undisputed that "[t]here has been a long history of a cigarette excise tax in this . . . [S]tate.  In fact, New York State has imposed a cigarette tax since 1939."  *N.Y.S. Ass'n of Tobacco & Candy Distributors, Inc. v. City of New York*, 3 Misc. 3d 876, 883 (N.Y. Sup. Ct., N.Y. Cnty. 2003) (citations omitted).  And as is particularly relevant in this case, § 474's inspection authority is as old as New York's cigarette excise tax—indeed, the relevant statutory language appears to have not materially changed in over three-quarters of a century.  *See* 1939 N.Y. Laws 3417, 3420-21, c. 940, § 1 ("The tax commission is hereby authorized to examine the books, papers, invoices and other records, stock of cigarettes in and upon any premises where the same are placed, stored and sold, and equipment of any such wholesale or retail dealer pertaining to the sale and delivery of cigarettes taxable under this article.")  Regulation for such a long period of time is more

than sufficient to make the scheme "sufficiently pervasive to make the imposition of a warrant requirement unnecessary." *Dewey*, 452 U.S. at 606.

*   *   *

After carefully considering each of the factors the Supreme Court has identified as being relevant to the question whether an industry is heavily regulated, the Court concludes that the cigarette industry in New York is, indeed, heavily regulated. This means that, for Fourth Amendment purposes, a cigarette retailer in New York has "a reduced expectation of privacy," *Burger*, 482 U.S. at 702, and that "the warrant and probable cause requirements" of the Fourth Amendment "have lessened application." *Id.* It is therefore irrelevant to the Court's Fourth Amendment analysis that New York law does not give cigarette retailers "an opportunity to obtain precompliance review before a neutral decisionmaker" prior to the DTF inspecting a retailer's store. *Patel*, 135 S. Ct. at 2452. Rather, because "the privacy interests of the [store] owner are weakened and the government interests . . . are concomitantly heighted, a warrantless inspection" of a cigarette retailer in New York State "may well be reasonable within the meaning of the Fourth Amendment." *Burger*, 482 U.S. at 702.

### B.  Whether the search in this case was "reasonable"

To determine whether a warrantless search of a closely-regulated business is "reasonable" within the meaning of the Fourth Amendment, the Supreme Court has identified three criteria that a search regime must satisfy. *See id.* at 702. The Court discusses each in turn.

### i. The government interest

First, for a warrantless search of a closely-regulated business to be reasonable, "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* (quoting *Dewey*, 452 U.S. at 602).

There is little serious question that New York State has a "substantial interest" in its scheme to regulate the distribution and sale of cigarettes. The State derives a large amount of revenue from its cigarette tax (Docket No. 51 at 15), but just as (if not more) important, that tax is meant to discourage cigarette use with the ultimate goal of improving public health—surely a substantial government interest. *See State of New York v. U.P.S., Inc.*, --- F. Supp. 3d ---, 2017 WL 1135257, at *6-7 (S.D.N.Y.) (finding the following "largely uncontested" facts: that "tobacco use kills approximately 28,200 New Yorkers each year"; that "tobacco-related healthcare costs New Yorkers $10.4 billion" annually; and that "[t]he State . . . of New York . . . impose[s] taxes on the sale and use of tobacco products, such as cigarettes, to combat these harms and to protect public health"). The State's inspection scheme supports these substantial goals by ensuring, first, that all cigarettes sold in New York State are taxed and, second, that that tax ultimately is borne by the consumer.

Moreover, given New York's large cigarette excise tax—the highest in the Nation—ensuring that the tax is collected, rather than evaded, is of obvious concern to the State. Data provided by the Attorney General demonstrate how great the State's interest is: In tax year 2016, State investigators conducted 1,054 inspections of retail vendors, of which 201—or 19.07%—were suspended. The prior tax year contained a nearly identical rate—19.1%—of violation-related suspensions (166 suspensions from

869 inspections).[7]  *See* Docket No. 51 at 9.  Of course, a warrantless search cannot be justified by how successful the search is in locating contraband.  But the significant rate of non-compliance shows that the State has a not-insubstantial problem in enforcing its laws related to the State's cigarette excise tax.  This non-compliance strengthens the State's already-substantial interest in its administrative search program.

The Defendant attempts to reframe this issue by arguing that New York's interest is only in ensuring that retailers maintain proper records, and that this interest does not necessitate warrantless searches.  This argument, however, understands the State's interest too narrowly.  New York's interest is not just in ensuring that retailers maintain invoices for their cigarettes; instead, the State's interest is in ensuring that cigarettes are sold in the proper manner and subject to applicable taxes.  Proper record-keeping is central to those goals because it provides the State with an additional way of ensuring that a retailer's stock of cigarettes complies with the State's excise tax.  Given the tight restrictions on cigarettes' entry into the retail market in New York, *see Oneida Nation of New York*, 645 F.3d at 158, if a retailer is unable to provide appropriate records for the cigarettes on its premises, an inspector may have reason to suspect that the retailer is selling illegal cigarettes.  Proper record keeping is, then, as important a State interest as ensuring that a retailer sells only properly-taxed cigarettes.

## ii.    The necessity of warrantless searches

Second, to be reasonable for Fourth Amendment purposes, a "warrantless inspection[] must be 'necessary to further the regulatory scheme.'"  *Burger*, 482 U.S. at

---

[7]  These statistics do not include inspections conducted by the New York City Department of Finance. Docket No. 51 at 9 n.3.  In tax year 2014, the DTF inspected 560 retail vendors, of which 40 were suspended (7.1%).  The Attorney General does not provide a reason for this lower suspension rate, nor is one apparent.  A 7% suspension rate, however, while lower than the suspension rates in tax years 2015 and 2016, is still high.

703 (quoting *Dewey*, 452 U.S. at 600) (brackets omitted). The Supreme Court has repeatedly affirmed the need for surprise inspections of heavily-regulated businesses where "the prerequisite of a warrant could easily frustrate inspection." *Biswell*, 406 U.S. at 316. *See also Burger*, 482 U.S. at 710; *Dewey*, 452 U.S. at 602-03. This requirement is relatively easy for the State to satisfy because, at bottom, the requirement "as applied does not really rest on a showing that the warrant process would be other than inconvenient." 5 LaFave, et al., *Search and Seizure* § 10.2(f) at 85. Given the number of searches the DTF has carried out in recent years—1,054 in tax year 2016, 869 in tax year 2015, and 560 in tax year 2014, *see* Docket No. 51 at 9[8]—a warrant requirement would unquestionably be "inconvenient."

But even if a warrant requirement were not simply inconvenient, it would still risk frustrating the purpose of New York's cigarette inspection scheme. Cigarettes are easily concealed, and if the DTF were required to obtain a warrant before conducting a search, in the time it would likely take to do so, unstamped cigarettes could quickly be hidden or destroyed. A warrant requirement, in other words, could easily "interfere with the statute's purpose." *Burger*, 482 U.S. at 710.

Finally, given the large number of retailers licensed to sell cigarettes in New York State—22,867 in tax year 2016, *see* Docket No. 51 at 9—a retailer that sells unstamped cigarettes may reasonably believe that he or she has a low chance of being inspected. Given this reality, "surprise is crucial if [New York's] regulatory scheme aimed at remedying" the problem of untaxed cigarettes "is to function at all." *Burger*, 482 U.S. at

---

[8] These figures exclude searches conducted by the New York City Department of Finance. *See* Docket No. 51 at 9 n.3.

710. The risk of a surprise inspection, in other words, dampens, at least somewhat, a retailer's belief that he or she can sell illegal cigarettes without fear of being caught.

### iii. The certainty and regulatory of the inspection program

Third and finally, to be "reasonable," a warrantless search of a heavily regulated business must be conducted pursuant to a statutory scheme or inspection program whose terms provide "'certainty and regulatory of [the scheme's] application," so as to "'provide a constitutionally adequate substitute for a warrant.'" *Id.* at 703 (quoting *Dewey*, 452 U.S. at 603) (brackets omitted).

Section 474(4) provides a substitute for many of a warrant's notice provisions. The statute authorizes the DTF "to examine," among other things, a retailer's "books, papers, invoices and other records . . ., and the equipment of any such person pertaining to the stamping of cigarettes or the sale and delivery of cigarettes or tobacco products taxable . . ., as well as the stock of cigarettes or tobacco products." The statute, then, informs a cigarette retailer that "the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute." *Burger*, 482 U.S. at 711. And like a warrant, § 474(4) "sets forth the scope of the inspection"—the retailer's books and records, his cigarette-stamping equipment, and his cigarette stock—and it "notifies the [retailer] as to who is authorized to conduct an inspection," *id.*—that is, the Commissioner of Taxation and Finance "or his duly authorized representatives." N.Y. Tax Law § 474(4). *See Burger*, 482 U.S. at 711 (finding that the scope of a statute authorizing inspections of automobile junkyards was sufficiently limited where statute authorized search of junkyard's books and records, as well as "any vehicles or parts of vehicles which are subject to the record keeping

requirements of this section and which are on the premises") (quotation marks omitted). Thus, in many ways § 474(4) fulfills the purposes of the Fourth Amendment's warrant requirement.

At the same time, however, the statute is open-ended in ways that might invalidate a warrant. It only nominally limits the location of a permissible search, allowing investigators to inspect "any premises" where cigarettes might be stored or sold. N.Y. Tax Law § 474(4). And the statute does not limit the times during which a search may be conducted. *Compare Burger*, 482 U.S. at 711 (noting that the statute at issue limited searches to the "regular and usual business hours" of the junkyard) (quotation marks omitted). The Court addresses each concern in turn.

### a. Section 474(4)'s limits on the locations that may be searched

First, whether, as an abstract matter, § 474(4) imposes any limits on the locations an investigator may search, the statute provides no less particularity than the regulatory search statutes the Supreme Court has previously upheld against Fourth Amendment challenges. For instance, in *United States v. Biswell*, the Court considered a warrantless search conducted pursuant to the Gun Control Act of 1968. At the time, the relevant provision of the Act permitted agents to "enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, dealer, or collector." *Biswell*, 406 U.S. at 312 n.1 (citing the then-in-force version of 18 U.S.C. § 923(g)). If anything, § 474(4) is narrower than the statute considered in *Biswell*: it permits searches of "any premises," but it does not expressly include, as the statute in *Biswell* did, "places of storage." *See also Colonnade Catering Corp.*, 397 U.S. at 73 n.1 (considering statutes allowing the search of "the premises

(including places of storage) of any dealer" and "any building or place where any articles or objects subject to tax are made, produced, or kept") (quotation marks omitted).

Further, the manner in which the New York Court of Appeals has interpreted— and, in doing so, cabined—§ 474(4) provides more support for the conclusion that the statute is a sufficient substitute for a warrant.  In *People v. Rizzo*, 40 N.Y.2d 425 (1976), the Court of Appeals held that § 474(4) allows warrantless inspections "only . . . where there is probable cause to believe that the regulated activity [i.e., the sale of cigarettes] is being conducted at that location." *Id.* at 428.  This requirement is satisfied, however, where—as in this case—a cigarette retailer "is open and notorious, either by license or by holding himself out to the public." *Id.*[9]  More relevant here, when DTF investigators conduct a warrantless inspection, they may "insist[], in a nonforcible manner, on entry into a locked storeroom, provided they reasonably believe[] it contained cigarettes." *Id.* at 428-29 (quoting *Colonnade Corp.*, 397 U.S. 72 (1970)); *See v. City of Seattle*, 387 U.S. 541 (1967); and *United States v. Biswell*, 406 U.S. 311 (1972)).  The authority conferred by § 474(4), however, "would not extend to articles of personal property not used in the business or whose ownership was unknown." *Id.* at 429.

At bottom, § 474(4)'s authority is broad, but it does not allow DTF investigators to search as if they had a general warrant  *See People v. Sciacca*, 45 N.Y. 2d 122, 128-29 (1978) (reaffirming *Rizzo*'s interpretation of § 474(4)).  At a certain point, investigators must have some cause to continue their search.  Thus, § 474(4)'s limits on the places that investigators may search sufficiently constrains the discretion of investigators such that the statute acts a substitute for a warrant.

---

[9]  As the Court does here, the Second Circuit has relied on a state court's interpretation of a state statute to decide whether that statute complies with the Fourth Amendment.  *See United States ex rel. Terraciano v. Montanye*, 493 F.2d 682, 685 (2d Cir. 1974).

## b. Section 474(4)'s limits on the times during which a search may be conducted

Section 474(4) does not limit the times during which DTF investigators may conduct a warrantless search of a cigarette retailer. *See, e.g.*, *Burger*, 482 U.S. at 711 (discussing statute limiting inspections to "the regular and usual business hours") (quotation marks and brackets omitted). Similarly, the record does not show whether, despite § 474(4)'s silence on this issue, the DTF has a policy of conducting warrantless searches only during business hours. *See United States ex rel. Terraciano v. Montanye*, 493 F.2d 682, 685 (2d Cir. 1975) (Friendly, J.). And, finally, this does not appear to be a case (or, at least, the record does not reflect) where industry norms require the possibility of inspection 24 hours per day. *See, e.g.*, *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009) (addressing this rationale in the context of a statute allowing 24-hour-a-day searches of commercial trucks).

Nonetheless, the New York Court of Appeals' interpretation of § 474(4) reads into the statute, by implication, time limits that constrain the discretion of state investigators. As noted, the Court of Appeals has interpreted § 474(4) to allow DTF investigators to "insist[]" on entry into a locked storeroom, *Rizzo*, 40 N.Y.2d at 429, but, according to the Court of Appeals, "[t]his does not mean that [an investigator] has the authority to break and enter." *Sciacca*, 45 N.Y. 2d at 128. *See also id.* at 128-29 ("In the instant case there was no authority . . . in the statute . . . to enter forcibly.") It follows, then, that DTF investigators may conduct a search of a cigarette retailer's premises only during a time when an employee is at the premises and able to let the investigators in. Indeed, one of the DTF investigators in this case confirmed that the DTF's "civil authority" allows

investigators "to come in and make sure that they meet compliance *as long as the store's open.*"  Tr. 68:11-14 (emphasis added).

Thus, § 474(4), as interpreted, sufficiently limits the discretion of investigators by limiting the times during which they may search a cigarette retailer.

*    *    *

For the reasons stated above, the Court concludes that searches conducted pursuant to § 474(4) are "reasonable," as the Supreme Court has defined that term in the context of searches of heavily-regulated businesses.  As a result, the Court concludes that warrantless administrative searches conducted pursuant to § 474(4) are "reasonable" within the meaning of the Fourth Amendment.

## 2. The Defendant's arguments as to the intent and purpose of the DTF investigators

The Defendant makes several other objections to Judge Scott's recommendation to deny her suppression motion.  These objections assume, as the Court has now concluded, that searches conducting pursuant to § 474(4) are "reasonable" within the meaning of the Fourth Amendment.  The Defendant's objections concern the conduct of the DTF investigators during the search and the presence of federal agents during the search.  These facts, the Defendant argues, show that this was not a true regulatory search.  Instead, the Defendant argues that these facts show that the search was a pretextual regulatory search designed to end-run the Fourth Amendment's warrant requirement.

### A.  The DTF investigators' conduct during the search

The evidence introduced at the suppression hearing sometimes suggested that the DTF investigators exceeded the authority that § 474(4) confers upon them or, at the

very least, that they understood their authority to be broader than it actually is. For instance, one investigator testified that he was authorized to search the Defendant's purse on the theory that "there can . . . be illegal tobacco or cigarettes hidden in there."[10] Tr. 79:17-18. *Rizzo*, of course, holds to the contrary. *See* 40 N.Y. 2d at 429. Similarly, directing the Defendant to unlock an ATM in the store, as the DTF investigators did in this case (presumably on the theory that contraband cigarettes could be stored in an ATM, but without any apparent reason to suspect that they were), is near the edge of what, according to *Rizzo*, § 474(4) authorizes, at least when investigators have no reason to think that contraband might be hidden in such a location. *See Rizzo*, 40 N.Y. 2d at 429 ("[T]he agents could have insisted, in a nonforcible manner, on entry into a locked storeroom, provided they *reasonably believed it contained cigarettes*.") (emphasis added, citations omitted).

But even if the agents did sometimes conduct their search near the edge of their authority, they also searched locations where they were unquestionably permitted to search. And it was in those locations—not the more questionable locations, such as the deli's ATM—where the investigators located the synthetic marijuana at issue in this case. Specifically, DTF Investigator Gina Barbera testified that, upon entering the deli, she saw the Defendant, who was standing behind the counter, "throw[] a box underneath the sales counter." Tr. 36:15-16. Inside that box was a cigar box, and inside the cigar box was synthetic marijuana. Tr. 36:19-21. It was certainly reasonable for Investigator Barbera to believe that the box she searched might contain contraband

---

[10] The investigator also testified that the Defendant's purse could be searched to ensure that it did not contain a weapon that might be used against one of the investigators. Tr. 79:12-14. The record does not show, however, that such a justification would be appropriate in this case because, among other reasons, the record does not show that the Defendant's purse was in an "area within [her] immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969) (quotation marks omitted).

once she saw the Defendant throw the box after the investigators entered the store, identified themselves, and announced their purpose. Tr. 9:10-11; 103:4-6. The second location in which Investigator Barbera found synthetic marijuana was likewise a location where she was clearly entitled to search. That synthetic marijuana, Investigator Barbera testified, was found in an open bag "tucked under the sales counter on the floor." Tr. 43:5-6.

Because the investigators were permitted to search the locations in which they found the synthetic marijuana, any conduct that might have exceeded what the Fourth Amendment allows does not render other parts of the search invalid. Put another way, a constitutionally-questionable aspect of a regulatory search does not necessarily render the entire search invalid. *Cf. United States v. George*, 975 F.2d 72, 79 (2d Cir. 1992) ("When a warrant is severed (or redacted) the constitutionally infirm portion— usually for lack of particularity or probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted."); *id.* at 80 ("In determining whether that doctrine [i.e., the plain view doctrine] applies in the case of a redacted warrant the trial court must therefore ask if, when the officers came upon the item found in plain view, they were in a place where the *redacted* warrant—or a provision of the original warrant as to which the good faith exception applies—authorized them to be.") (emphasis in original). There is no question that the DTF investigators properly searched the locations in which they found synthetic marijuana. It is also clear that the one potentially unconstitutional portion of search—the search of the deli's ATM—is "distinguishable" from the remainder of the search. *Cf. United States v. Galpin*, 720 F.3d 436, 449 (2d Cir. 2013) (discussing the

analysis for redacting a partially-invalid search warrant). That is, the likely invalid part of the search "make[s] up 'only an insignificant or tangential part'" of the search—not the other way around. *Id.* (quoting *George*, 975 F.2d at 80). Thus, those few and isolated portions of the investigators' search that may have gone beyond what § 474(4) permits did not render the rest of the search invalid.

Finally, the Defendant argues that the way in which the DTF investigators conducted their search undermines their assertion that they were conducting a true regulatory inspection. The Defendant first points to the fact that a DTF investigator testified that she was searching for, among other things, "trap doors." Tr. 54:13-18. Given that cigarettes are small and easily-concealed, this complaint is without merit. If the investigators were lawfully in Mario's Deli to search for untaxed cigarettes—which they were—they were authorized to look in, or for, locations (such as trap doors) where cigarettes could reasonably be concealed. *See Harris v. United States*, 331 U.S. 145, 152 (1947), *overruled on other grounds*, *Chimel v. California*, 395 U.S. 752 (1969) ("The same meticulous investigation which would be appropriate in a search for two small cancelled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still."); *United States v. Gamble*, 388 F.3d 74, 76-77 (2d Cir. 2004) ("The officers in this case had a Fourth Amendment justification for searching the contents of [the defendant's] drawer because they had a warrant authorizing them to search for and seize cocaine and drug paraphernalia—items that could plausibly be found in a dresser drawer.")

Similarly, the Defendant points to testimony from a Mario's Deli customer that, following the inspection, the deli's back room "was just trashed." Tr. 135:9-10. While,

perhaps, "not favored," this conduct "does not necessarily violate the Fourth Amendment; the standard is reasonableness." 2 LaFave, et al., *Search and Seizure* § 4.10(d) at 971-72 (discussing this principle in the context of property destruction during the course of a search). The Defendant testified that she cleaned the deli's back room that evening, after the investigators completed their search. Tr. 159:18 – 160:7. The fact that the back room could be easily (if, to be sure, inconveniently) returned to an organized state shows that the investigators' search was not so intense as to be unreasonable, particularly given that cigarettes are small and can, therefore, be easily concealed. The Defendant points to nothing suggesting that the Fourth Amendment requires an officer to clean up after a search, and while doing so may be salutary, an officer's failure to do does not render his conduct unlawful.

### B. The DTF investigators' intent in conducting the search, and the presence of federal agents during the search

Finally, the Defendant argues that the search in this case violated the Fourth Amendment because, in the Defendant's view, the primary goal of the search was to uncover illegal narcotics, rather than evidence of regulatory violations.

An officer's subjective purpose for conducting a search or seizure is, of course, generally irrelevant to the search or seizure's constitutionality. *See Whren v. United States*, 517 U.S. 806, 813 (1996). But this is not always true: in the context of an administrative search, "the purposes (and therefore scope) of the search are indeed relevant." *Anobile v. Pelligrino*, 303 F.3d 107, 122 (2d Cir. 2001) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 45-47 (2000)).

The standard for finding that an administrative search was unconstitutionally pretextual "is hazy and ill-defined." *United States v. Gigliotti*, 145 F. Supp. 3d 203, 210

(E.D.N.Y. 2015). There is no question that administrative and criminal investigations may, at least as a general matter, proceed in parallel, and the fact that certain conduct may violate both criminal and administrative statutes does not mean that both criminal and administrative agents may not investigate that conduct. *See United States v. Funaro*, 253 F. Supp. 2d 286, 296-97 (D. Conn. 2003) (Droney, J.) (collecting cases and concluding that "[l]aw enforcement agents may conduct an administrative inspection for the simultaneous pursuit of an administrative objective and the gathering of evidence for criminal purposes if the administrative inspection is authorized and legitimate"). *See also Burger*, 482 U.S. at 716 ("The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect.") The more difficult question, and the one presented here, is whether an administrative official enforcing a regulatory scheme may, in some fashion, assist in the enforcement of a criminal statute.

The Supreme Court has strongly suggested on several occasions that an administrative search is unconstitutionally pretextual when the primary intent of the search was to uncover evidence of a crime, rather than evidence of regulatory violations. Specifically, a warrantless, suspicion-less search whose "*primary* purpose . . . is to uncover evidence of ordinary criminal wrongdoing . . . contravenes the Fourth Amendment." *Edmond*, 531 U.S. at 41-42 (emphasis added). That is, if the search was "specifically designed to gather evidence of violations of penal laws," it is unconstitutional. *Ferguson v. City of Charleston*, 532 U.S. 67, 83 n.23 (2001). *See also id.* at 84 ("[W]hen [government employees] undertake to obtain [evidence of criminal conduct] from their patients *for the specific purpose of incriminating those patients*, they

have a special obligation to make sure" that patients provide valid consent to a search) (emphasis in original).[11]

The evidence introduced at the suppression hearing suggested that the DTF investigators had no particularized suspicion that synthetic marijuana would be found at Mario's Deli on the evening of their search. But they did anticipate the possibility of finding synthetic marijuana during their inspection. That expectation, however, does not transform the DTF investigators' administrative search into a pretextual search for evidence of a crime. Nothing in the record suggests that, whether or not they expected to find synthetic marijuana, the DTF investigators were not *also* conducting a valid regulatory search. If the agents expected to find synthetic marijuana during their otherwise-proper administrative search, the investigators are not precluded from carrying out their duty—as, the record shows, they did—of ensuring that all cigarettes sold in a particular store are properly-taxed. Indeed, under the Defendant's theory, if DTF investigators suspected that a particular store might contain evidence of other crimes, the investigators would be precluded from performing any administrative inspection of that store. *See United States v. Gel Spice Co., Inc.*, 773 F.2d 427, 432 (2d Cir. 1985) (rejecting a similar argument in the context of parallel administrative and criminal investigations of violations of the Federal Food, Drug, and Cosmetic Act, because "[i]f it were otherwise, anytime a prosecution was undertaken, the FDA would be precluded temporarily in that particular instance from protecting the health and safety

---

[11] The Court here relies on cases involving so-called special needs searches, rather than administrative searches. Both types of searches, however, are often warrantless and suspicionless. They therefore implicate the same Fourth Amendment concerns, and their constitutionality—including arguments about pretext—are appropriately judged by similar standards. *See Burger*, 482 U.S. at 702 (analogizing administrative searches of closely-regulated business to special needs searches).

of the public, although this function constitutes the main purpose of the Act"). This makes little sense.

The fact that the DTF investigators were accompanied by two federal agents does change this conclusion. At the suppression hearing, a DTF investigator testified that the HSI agents accompanied the DTF investigators because the investigators had "been finding a lot of synthetic marijuana recently." Tr. 8:1. In those circumstances, DTF investigators "would normally . . . call [HSI] and then they would have to respond out to our location which could take . . . one, two hours depending on what they were doing or if they had to get called in so . . ." Tr. 8:2-5 (ellipsis in transcript). Consistent with their stated limited role, the HSI agents did not help the DTF investigators conduct their administrative search. Rather, HSI Agent Williams testified that, because the DTF investigators "took the lead," Tr. 101:25, he and an HSI Task Force Officer "followed them into the store," where his role was "just to kind of basically . . . secure the scene, assist them . . . with getting customers out of the store. Just general administrative type duties." Tr. 102:1-6. *See also* Tr. 103:8-11 ("I was just kind of there to notify customers that, you know, they would have to hurry up and finish up their purchases, keep other people from coming in the store during the inspection.") In these circumstances, where the HSI agents did not help conduct the DTF investigators' search, there is nothing improper about the HSI agents accompanying the DTF investigators for the sake of efficiency. *Cf. United States v. Reyes*, 283 F.3d 446, 464 (2d Cir. 2002) (after rejecting a "stalking horse" defense to a home inspection by a federal probation officer, where probation officer coordinated inspection with DEA agents, noting in dicta that "the law

permits such cooperation as long as the probation officers are pursuing legitimate probation-related objectives").

Thus, the Defendant's arguments about the conduct of the DTF investigators and the presence of two federal agents during the search do not make the inspection unconstitutional. The Defendant's objections are therefore overruled, and the Court adopts Judge Scott's recommendation to deny the Defendant's suppression motion.

### C. Suppression of the Defendant's statements

The Defendant, as noted, also moves to suppress the statements she made to Agent Williams. Both parties agree that the sole issue for the Court to decide is whether the Defendant was in "custody," for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), when Agent Williams interviewed her following the discovery of the synthetic marijuana. Judge Scott recommends concluding that the Defendant was not in custody. The Defendant objects to this conclusion.[12]

*Miranda* warnings are, of course, required only when a suspect is subject to "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). As noted, the only question in this case is whether the Defendant was in "custody" for purposes of *Miranda*.

"An accused is in 'custody' when, in the absence of actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (quotation marks omitted). "[T]he overarching 'custody' question is whether a

---

[12] Judge Scott also concluded that Agent Williams did not "interrogate" the Defendant when he interviewed her. The Defendant does not object to this recommendation. Because the Court concludes that the Defendant was not in custody—and, thus, that *Miranda* warnings were not required—the Court need not address the issue of "interrogation" under *Miranda*.

reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with formal arrest." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (quotation marks and brackets omitted).

This is an objective question. *See United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2004). To determine whether a reasonable person in the Defendant's position "would have understood [her]self to be subjected to the restraints comparable to those associated with a formal arrest," *id.* at 673 (quotation marks omitted), the Court must "consider[] the circumstances surrounding the encounter with authorities. Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (citations omitted). The circumstances giving rise to "custody" for *Miranda* purposes "also include . . . the nature of the questions asked." *Id.* Relatedly, "[a] reasonable person's expectations about how the questioning is likely to unfold are also relevant." *Id.* Finally, "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Ali*, 68 F.3d at 1472-73.

Many of the facts in this case support the conclusion that the Defendant was not in "custody" when Agent Williams interviewed her. The agents asked the Defendant if she would be willing to speak to them; they spoke to the Defendant in her parents' deli, where she worked, and not in an unfamiliar location or one typically associated with law enforcement; the agents spoke to the Defendant in a private, though not confined, part of the deli; they remained civil and calm; although it appears the agents' firearms were visible, their firearms remained holstered; they did not handcuff the Defendant; they informed the Defendant that she was free to leave; and they conducted a relatively brief interview. Taken together, these facts strongly suggest that a reasonable person would not have felt restrained in a way that is comparable to formal arrest.

On the other hand, two facts suggest that a reasonable person in the Defendant's position might have understood herself "to be subjected to restraints comparable to those associated with a formal arrest." *FNU LNU*, 653 F.3d at 153 (quotation marks omitted). First, the unannounced entry of a number of law enforcement officers (the record is unclear, but it appears seven to eight officers entered the deli) for a relatively simple regulatory search for cigarette invoices and unstamped cigarettes might create the sort of "police-dominated atmosphere," *Miranda*, 384 U.S. at 446, that suggests to a reasonable person that she is restrained in a way comparable to formal arrest. *See United States v. Faux*, 828 F.3d 130, 137-37 (2d Cir. 2016) (where 10-15 agents were present for search of defendant's home "for a paperwork fraud scheme," concluding that the "number of officers present for the search . . . gives considerable pause" because it "raises the question of where in her home [the defendant] could go if she was indeed 'free to leave'"). And second, a Niagara County

Sheriff's Deputy entered with the agents, stood in front of the door, and prevented customers from coming in. Indeed, the Defendant testified that, at least from her view, the door was locked and "[c]ustomers were trying to get in, they would unlock it and tell the customers the store is currently closed." Tr. 158:21-23. Each of the DTF investigators testified that the number of officers was, in part, a safety precaution, as was having a Sheriff's Deputy guard the door. The Court does not suggest that these are not reasonable precautions. The Court notes only that a reasonable person might interpret these facts as an indication that they were restrained in the same way that they would be if they were, in fact, under arrest.

In addition to these facts, the Defendant points to Agent Williams's statement during the interview that selling synthetic marijuana is a violation of federal law and that "providing information" to Agent Williams "would not be a bad thing." Tr. 116:16-20. The circumstances giving rise to "custody" for *Miranda* purposes "include . . . the nature of the questions asked," and "[a] reasonable person's expectations about how the questioning is likely to unfold." *FNU LNU*, 653 F.3d at 153 (citations omitted). But this does not mean that a suspect is in "custody" every time an officer asks probing questions or says something that makes the interviewee uncomfortable—such as, in this case, telling the Defendant that synthetic marijuana had killed people. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (*per curiam*) (brackets omitted). On the whole, and particularly given Agent Williams's calm and civil demeanor, "[t]here is no indication

that [Agent Williams's] questioning was any more coercive than what would be expected in any questioning by a police officer of an individual suspected of a crime." *United States v. Simmonds*, 641 F. App'x 99, 103 (2d Cir. 2016).[13]

Considering all of the facts, the Court concludes that the Defendant was not in "custody" for *Miranda* purposes when Agent Williams questioned her. Some of the circumstances surrounding the search in this case—namely, the number of officers in the deli and the presence of a Sheriff's Deputy blocking the deli's door—might suggest to a reasonable person that they were in a coercive police-dominated atmosphere. Judged as a whole, however, the facts surrounding Agent Williams's interview of the Defendant show that a reasonable person in the Defendant's position would not have felt as if they were "subjected to restraints comparable to those associated with formal arrest." *FNU LNU*, 653 F.3d at 153 (quotation marks omitted). A ten-minute interview conducted by "calm" and "civil" law enforcement officers in a relatively open part of the Defendant's parents' deli, together with the fact that the agents informed the Defendant that she was free to leave, do not, taken with the other facts in this case, show that a reasonable person in the Defendant's position would have felt as if she was subjected to restraints comparable to those associated with formal arrest. The Defendant was not, therefore, in "custody" for *Miranda* purposes. Her motion to suppress her statements to Agent Williams is therefore denied.

---

[13] Similarly, the Defendant's testimony that she "thought [she] was getting arrested" if she did not cooperate (Tr. 158:10) is irrelevant for *Miranda* purposes. It is well settled that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

**CONCLUSION**

For the reasons stated above, the Court adopts Judge Scott's recommendation to deny the Defendant's motion to suppress evidence from the search of Mario's Deli. The Court also adopts Judge Scott's recommendation to deny the Defendant's motion to suppress her statements.[14]

The parties shall appear on April 28, 2017 at 9:00 a.m. for a meeting to set a trial date.

**SO ORDERED.**

Dated: April 27, 2017  
Buffalo, New York

_s/Richard J. Arcara_  
HONORABLE RICHARD J. ARCARA  
UNITED STATES DISTRICT JUDGE

---

[14] In its response to the Defendant's objections, the Government notes that a statement must be found to be voluntary before it can be used at trial.  *See* 18 U.S.C. § 3501(a).  If this case proceeds to trial, the Court will address the voluntariness of the Defendant's statement as part of pretrial proceedings.